Whitehead, J.
This is an action brought by one property owner against another property owner to recover damages suffered as the result of hazardous waste contamination. The plaintiffs claims are based on the provisions of G.L.c. 21E, negligence and nuisance.
The case was tried by the Court between June 16, 1994 and June 22, 1994. The following constitute the Court’s findings, rulings and order for judgment pursuant to M.R.Civ.R 52.
Findings of Fact
The plaintiff, Eric Rothenberg, is an attorney who specializes in taxation issues. He has been practicing privately since 1980. Since the early to mid-1980s he has also invested in and managed real estate. In the late 1980s he was a co-founder of a bank, and for some period of time thereafter he participated in the management of the bank as a director and member of the loan committee.
The defendants Adam Porikos and Maria Porikos own the property at 11 Longwood Avenue in Brookline. They acquired the property in 1981. Since that time, the defendant Longwood Auto Specialists, Inc. has operated a gasoline service station, known as Mike’s Texaco, on the premises. Adam Porikos owns all of the stock in Longwood Auto Specialists, Inc. He has been physically present at the gasoline station and has personally managed it since 1981. Maria Porikos has never worked at the station or personally participated in any of the station’s operations.
Mike’s Texaco is located in the Coolidge Corner section of Brookline, at the intersection of Longwood Avenue and Sewall Avenue. It is situated across Sewall Avenue from the premises known as 21 Longwood Avenue. The premises at 21 Longwood Avenue consist of 12,300 square feet of land, on which there is located a two-stoiy brick building. The building occupies approximately one-third to one-half of the property. The remainder consists of a parking area having the capacity to hold 20-22 automobiles. In this regard, the property is unique to Coolidge Corner, where parking is otherwise limited.
In late 1976, the plaintiff became interested in acquiring the property at 21 Longwood as an investment. To that end, he and his then law partner, one Harry Miller, formed a nominee trust having the plaintiff and Miller as trustees and beneficiaries. There were two additional beneficiaries. Since that time, through transactions not fully developed during the trial, the plaintiff has become the sole trustee and his current wife the sole beneficiary. The trust is denominated as the “21 Longwood Realty Trust.”
The plaintiff and his associates obtained from the then owner an agreement to sell the property at 21 Longwood Avenue in December 1986. In order that the purchasers might avail themselves of certain tax advantages which would otherwise lapse at the end of 1986, the sale itself was hastily effectuated. The closing occurred on December 31, 1986. The plaintiff and his associates paid $100,000 up front. The seller, an entity known as the Chicos Family Trust, gave the plaintiff and his associates temporary financing. It was agreed that if the purchasers could not obtain bank financing within six months, the sale would be rescinded and the parties restored to status quo. The total sale price was $1.4 million.
*440 The plaintiff promptly applied to the BayBank for a loan. As a condition of granting the loan, the bank required that the plaintiff subject the property to a “21E evaluation," an evaluation to determine the likelihood that hazardous waste was present on the property. To that end, the plaintiff retained I.E.S., Inc. to perform the evaluation. After undertaking an historical review of the subject property and its neighboring properties, but without undertaking any test borings on the subject properly, I.E.S. concluded in May of 1987, that the property was likely free of contamination.
Because the conclusion of I.E.S. was rendered without the benefit of test borings, it was not acceptable to BayBank. Accordingly, the plaintiff directed I.E.S. to supplement its evaluation with results from the necessary borings. I.E.S. complied, and on June 22,1987, it prepared a report of its work (Ex. #2). The material portions of the report are as follows:
The results of this project indicate that there was a release of what appears to be gasoline from a source off the site in question. Most probably the service station across the street. This release occurred some time in the past... [T]he petroleum in the soil is at least five years old and has degenerated appreciably due to natural dissipation in the subsurface soils and will continue to do so.
. . . Findings detailed in this report are that I.E.S considers the site in question to exhibit a minor release, from a remote source, of petroleum products, however, this does not pose an imminent health threat nor does it exceed state protocols for remedial or monitoring action.
Despite a date stamp on the report suggesting otherwise, the plaintiff received the report, or at least became aware of its contents, sometime in late June 1987.
The Court finds that the I.E.S. report of June 22, 1987 did not apprise the plaintiff that the property at 21 Longwood had suffered any actionable damage as a result of contamination from Mike’s Texaco, nor did it reasonably put him on notice to investigate further the possibility of such damage. What was portrayed in the I.E.S. report was a release of gasoline that had occurred in the distant past, the effects of which were minimal and decreasing over time. Moreover, the report gave no indication that the evaluation process had been incomplete or that further evaluation might lead to a different conclusion.[1]
Equally as important, it has not been established by a preponderance of the evidence that the release detected by I.E.S. in 1987 is the same release which is the basis of this action. Most notable in that regard is the fact that, in 1987, no levels of benzine and only trace levels of toluene were detected in soil samples, thus indicating “degraded petroleum products." In later testing which became the basis for this action, high levels of those constituents were detected. The inference is warranted that the later testing detected a release distinct from, and of more recent origin than, that detected in 1987.
Having itself received the June 22, 1987 I.E.S. report, BayBank closed on the plaintiffs loan by the end of June 1987. The amount of the loan was $1 million and was secured by a first mortgage. Interest on the loan was at a rate of 10%. The seller extended an additional loan in the amount of $300,000, which amount was secured by a second mortgage. As already noted, $100,000 had been paid up front at the time that the sale of the property had closed.
In December 1986, when the 21 Longwood Realty Trust had taken title to the property, there were two tenants who, between them, occupied the entire building. The Chickering Insurance Company occupied the entire first floor. The Baystate Bank occupied the entire second floor. The building remained fully occupied and under the plaintiffs management for a year and a half, at which time the lease of the Baystate Bank expired. At approximately the same time, the Chickering Insurance Company also indicated a desire to move out.
The plaintiff found it difficult to find tenants to fill the vacancies which had been created and were about to be created. Chickering eventually moved out, and, from that point on, only two or three minor tenants were secured, who rented small portions of the building. Feeling a personal financial strain which was exacerbated by his purchase of a new residence, the plaintiff retained the Hunneman Company, a commercial real estate agency, to find either a buyer or a major tenant for 21 Longwood.
In January 1989, the plaintiff received an offer to purchase the property in the amount of $1.8 million from the Combined Jewish Philanthropies. However, the deal fell through when the purchaser was unable to secure town approval to operate a day-care facility on the premises.
In February 1989, the plaintiff entered into purchase and sale negotiations with the Lown Group Realty Trust, an entity acting on behalf of a group medical practice. A purchase price of $1.725 million was ultimately agreed upon. The parties entered into a formal purchase and sale agreement (Ex. #3) on April 5, 1989, which agreement was secured by a deposit of $50,000. Pursuant to Paragraph 21 of the agreement, the deposit would constitute liquidated damages in the event of a breach by the purchaser, and those damages would “constitute seller’s sole remedy at law or in equity." The closing was to occur on May 15, 1989.
Paragraph 32 of the purchase and sale agreement provided, “Prior to the closing, Buyer may perform ... Chapter 21E site assessments . ..” Being aware of the I.E.S. report of June 22, 1987, the Lown Group elected to undertake such an assessment. It too, retained I.E.S. to do the job.
*441 The site assessment was not undertaken before the original closing date of May 15, 1989. As a result, the plaintiff advised the Lown Group that he would not consider the Lown Group’s dissatisfaction with whatever site assessment that was done to be a valid basis for voiding the deal. He reminded the Lown Group of the $50,000 deposit which he was holding as liquidated damages in the event of a breach. However, it was agreed that the closing would be extended until June 19, 1989 and that the question of what effect the site assessment would have would be taken up when the results of the assessment were in.
On June 12, 1989,1.E.S. attempted to perform the site assessment. Midway through the site assessment process, employees of I.E.S. were forced to stop. Gasoline fumes from test borings on the property were so intense that the workers deemed their safety to be in jeopardy. They summoned the plaintiff to the site and informed him of the situation. Upon receiving the news, the plaintiff walked across the street to Mike’s Texaco and spoke with the defendant Adam Porikos (“Mike”). The plaintiff told Mike that there were high concentrations of gasoline on his property and that the source of the gasoline was probably Mike’s Texaco. Mike replied that his properly could not be the source, as his tanks had recently been tested and found to be tight. He stated that gasoline must be migrating onto both his property and that of the plaintiff from an outside source.
The Court finds that it was not until this date, June 12,1989, that the plaintiffknew or had reason to know that an actionable wrong involving the contamination of his property by hazardous waste had occurred.
Upon learning what had happened during the site assessment, the Lown Group informed the plaintiff that it would not buy the property. The plaintiff countered that because the site assessment had been belatedly performed, the results of the assessment did not entitle the Lown Group to abandon the deal. He threatened to keep the deposit if the closing did not occur.
However, the plaintiff was in a difficult position. The validity of his claim to the deposit was unclear. Moreover, even if his claim was valid and if he retained the deposit, doing so was his exclusive remedy for a breach of the purchase and sale agreement. Thus, although he might end up with $50,000 in his pocket, he would still be holding a property for which he was having difficulty finding tenants and which was now subject to a contamination of unknown, but potentially disastrous, magnitude.
In order to mitigate his losses, the plaintiff elected to salvage the deal as best he could. Ultimately, on September 8, 1989, he entered into a “second amended purchase and sale agreement” with the Lown Group (Ex. #3).[2] Under the terms of that agreement, the closing date was extended for a period of ten years. The plaintiff agreed that, in the interim, he would take all necessary steps to deliver the property in a condition such that it required no further action under the Massachusetts Contingency Plan, 31 CMR 40.000 and had received a Certificate of Completion from the plaintiffs environmental consultant. If the property was not delivered in such a condition by September 15, 1994, the purchase price would be reduced to $1,675 million.
The “second amended purchase and sale agreement” also provided that, pending the sale, the Lown Group would lease the property for ten years. Pursuant to the lease, rent was established at $180,000 per year until September 1, 1994. If, at that time, the plaintiff could not deliver the property in clean condition and consummate the sale, the rent would be reduced to $130,000 per year.
I find that in securing the “second amended purchase and sale agreement,” the plaintiff took reasonable action to mitigate the damages which he was incurring as a result of the contamination of the property.
Shortly after the events of June 12, 1989 had put him on notice that his property was the subject of significant contamination, the plaintiff had notified the Massachusetts Department of Environmental Protection ("DEP”) of that fact. Fulfilling what he believed to be his obligations under Massachusetts law, he hired the environmental consulting firm of Fred C. Hart Associates to undertake a “Phase I” study of the site. A “Phase I” study is a limited evaluation undertaken to determine how great public exposure to contamination may be. Hart performed the “Phase I” study during the summer of 1989 and submitted a report of its results to the plaintiff on September 26, 1989. (Ex. #21, Appendix A.) Hart also assisted the plaintiff in obtaining a DEP waiver of the step-by-step approval process set forth in the Massachusetts Contingency Plan.
Through its “Phase I” study, Hart confirmed the presence of gasoline contamination on the property. Although it possessed insufficient information to make a conclusive determination relative to the source of that contamination, it identified Mike’s Texaco a “likely potential source.” Hart did conclude that the contamination had not created a significant hazard to the public.
Hart eventually ceased doing business in Massachusetts. When that occurred, the plaintiff retained the environmental consulting firm of Dames and Moore to continue the site assessment process. Dames and Moore undertook a “Phase II” site assessment. The purpose of a “Phase II” assessment is to further refine the information and conclusions derived from a “Phase I” assessment. Dames and Moore performed the “Phase II” assessment during the spring of 1990 and submitted a report of its results to the plaintiff on July 6, 1990 (Ex. #13). Its conclusions were essentially the *442 same as Hart’s conclusions. (The project manager in each case was the same individual.)
On December 7, 1990, the plaintiff retained the environmental consulting firm of Haley and Aldrich for the purpose of conclusively identifying the source of the contamination. Haley and Aldrich commenced performance of its services and continued to monitor and evaluate the site through at least March 1993. It submitted reports of its work to the plaintiff on March 14, 1991 (Ex. #14); May 14, 1991 (Ex. #15); May 4, 1992 (Ex. #10); and March 1, 1993 (Ex. #17). Essentially, those reports confirmed Mike’s Texaco as the source of contamination at 21 Longwood. They noted that the levels of contamination have generally declined with the passage of time.
When the defendants Adam and Maria Porikos bought Mike’s Texaco in 1982, there were four gasoline storage tanks on the premises. One of the tanks, having a storage capacity of 6,000 gallons, was made of steel and was brand new. The defendants retained that tank. However they immediately replaced three smaller tanks of lesser capacities with two fiberglass 6,000 gallon tanks.
From the time that he commenced management of the station, Mike compared his pump readings against “stick" measurements of the fuel in the tanks on a daily basis. He also compared his records of gallonage pumped versus gallonage delivered. (Deliveries occurred on a weekly basis.) In this way, he believed that he was able to determine whether the tanks were experiencing any significant leakage. However, he recognized that this process could only give him a rough idea as to whether or not leaks were occurring. Small leaks would not necessarily be detected. Using the process, he, in fact, detected no leaks.
Testing for tank tightness is regulated by 527 C.M.R. 9.13(1) and (3), which provide:
1) The owner of every new or existing storage facility shall have all new or replacement tanks and piping tested, at the owner’s expense, in accordance with this section during a period of 12-24 months after date of installation.
2) The owner of every existing storage facility which does not satisfy the design requirements of 527 C.M.R. 9.08 and 9.09 shall have each tank and its piping tested at the owner’s expense during the 10th, 13th, 15th, 17th and 19th year after installation and annually thereafter.
On February 9, 1989, the Town of Brookline sent the defendants notice that all of their tanks were overdue for testing as set forth in the regulations (Ex. #18). Based upon the evidence, the Court is unable to determine whether or not the tanks were, in fact, overdue for testing. Accordingly, it draws no conclusion in that regard.
On November 20, 1990, the defendants caused their gasoline storage tanks and piping to be tested by P.M. Environmental, of Manchester-by-the-Sea. That company specializes in tank testing and uses a specially adapted computer system for the purpose. The testing on November 20, 1990 revealed no leaks in the regular and mid-grade unleaded gasoline tanks and piping system. Testing on the super-unleaded tank and piping system was inconclusive due to external factors which affected interpretation of the computer results.[3] On December 30, 1990, P.M. Environmental retested the super-unleaded tank and piping system. The testing established that there was a leak in the piping system at a rate of .26 gallon per hour. The Court accepts that result, with a qualification to be discussed shortly.
P.M. Environmental notified Mike of the test results orally on December 30, 1990 and in writing a few days later. Mike immediately ceased pumping super-unleaded gasoline. He did not resume pumping until the system was repaired.
The repair occurred in July 1991. At that time, a contractor exposed the piping system and found that the area around a valve was “wet.” The valve was replaced. The Court infers, as the repairing contractor apparently did, that the valve was the source of the leak. The valve was located in a section of the piping close to the surface of the ground and a short distance from the pump itself. From the competent evidence, the court cannot determine whether the valve was constantly exposed to gasoline or whether exposure occurred only under circumstances where either the storage tank was completely full or the pump was in actual operation. Given that the burden of proof is on the plaintiff, the Court will assume the lesser exposure. Thus, total leakage from the piping system would be something less than .26 gallons per hour.
The central issue in this case is, of course, whether or not Mike’s Texaco was the source of the contamination at 21 Longwood Avenue. Experts testified on both sides of the issue. The Court accepts the testimony of the plaintiffs experts and concludes that Mike’s Texaco was the source of the contamination. It does so for several reasons.
First, it is established that as of at least December 30, 1990, there was a leak of unleaded gasoline emanating from the piping system at Mike’s Texaco. Although the magnitude and duration of that leak are unknown, it constitutes some evidence relative to the source of contamination.
Second, 21 Longwood is both topologically and hydrologically downgradient of Mike’s Texaco. That is, it is both “downhill” and, for purposes of groundwater flow, “downstream” of Mike’s Texaco. Thus, any gasoline contamination which did occur at Mike’s would tend to flow in the direction of 21 Longwood.
Third, gasoline contains a group of components which are known by their acronym, BTEX. These components were initially found in higher concentrations on the premises of Mike’s Texaco than at 21 *443 Longwood or other downgradient localities, thus suggesting that the contamination was at least flowing to those locations from the direction of Mike’s Texaco.
Fourth, although the concentrations of gasoline components were initially lower at 21 Longwood than at Mike’s Texaco, they were still sufficiently high that free floating gasoline itself could be found on top of the ground water at one point in the testing, thus suggesting the source to be close by.
Fifth, when the leak at Mike’s was repaired, soil and groundwater testing began to show a decline in the concentration of gasoline components at 21 Long-wood.
Sixth, the soil beneath Mike’s Texaco and 21 Long-wood was uniquely suited to accommodate migration of contamination from one to another.
Seventh, groundwater testing conducted at a location equally as downgradient and distant from Mike’s, but situated more to the north and west of Mile’s than 21 Longwood, showed lesser concentrations of BTEX, thus suggesting a source closer to the direction of Mike’s than to other more westward directions.
Eighth, other potential sources of contamination are ruled out. A Gulf station which was formerly located across Longwood Avenue from 21 Longwood was hydrologically upgradient from it, and in any event, test wells between that location and 21 Long-wood showed lesser contamination than the contamination found in wells at 21 Longwood. That finding is contrary to what one would expect if the Gulf station were the source. A Mobil station located on Webster Street is also hydrologically upgradient from 21 Long-wood and, in any event, is sufficiently distant that any release from there which would have left contamination in the magnitude found at 21 Longwood would also have had other catastrophic consequences to the general neighborhood that would have been widely noticeable. No such release has been documented.
It is true that the drilling of test wells upgradient of Mike’s Texaco might have established more conclusively whether or not Mike’s was the source of contamination, and that such drilling was not done. However, that drilling would have had to occur on the private property of unrelated parties and could not be accomplished.
It is also true that the samples taken from one of the many test wells exhibited characteristics of both leaded and unleaded gasoline and that Mike’s Texaco was not selling leaded gasoline at the time. The expert who identified Mike’s as the source of contamination could not account for that fact. However, because unleaded and leaded gasoline are presumably not stored in the same location, two different releases must have occurred at some point in time. This does not preclude Mike’s Texaco as the source of the unleaded release, which release was the primary contaminant of the area.
Lastly, it is also true that at least one test well which was drilled at the same gradient and approximate distance from Mike’s as those drilled on 21 Longwood, but which was located almost directly across Long-wood Avenue from Mike’s, showed generally lower concentrations of contamination than the wells at 21 Longwood. Such a situation might suggest that the contamination of 21 Longwood was emanating from a source other than Mike's. However, an expert for the plaintiff testified that this test result likely stemmed from a flow of groundwater running faster from Mike’s to 21 Longwood than from Mike’s, across Longwood Avenue, to the less contaminated well. The Court accepts that testimony.
Accordingly, on a consideration of all of the evidence, the Court finds by a preponderance of the evidence that Mike’s Texaco was the source of contamination to 21 Longwood.
The most recent testing of groundwater samples taken from 21 Longwood indicates that the level of contamination has declined since 1989 to a point where it falls within state safety standards (so called “GW-3 Standards”) in nearly all monitoring wells. It is likely that the decline will continue and that all wells will soon reach safe levels.
However, even though the leak at Mike’s has been repaired, and even though the resulting contamination of groundwater at 21 Longwood may have declined, or will soon decline, to state-mandated safety levels, the property at 21 Longwood is not yet eligible for a final “response action outcome,” i.e. state certification that it is clean. This is because, first, higher levels of contamination could still occur as gasoline continues to flow out of the contaminated soil (as opposed to the piping) at Mike’s. Second, even when it is established that no such recurring high levels of contamination are likely, the plaintiff will be required to restore his property to the condition that it was in before contamination, unless he can demonstrate that such a clean-up is unfeasible. Such a clean-up would be feasible if undertaken in conjunction with a cleanup of the contamination at Mike’s Texaco.
The best result that the plaintiff could hope to attain at the moment is a “Class C Response Action Outcome.” This constitutes temporary certification by the state that no further remedial action is necessary until Mike’s property is cleaned up. However, continued monitoring would be required in order to determine whether a final clean-up would be appropriate, and the potential that further clean-up would be required is very real.
Thus, the condition of 21 Longwood is such that the plaintiff cannot satisfy his obligation to the Lown Group under Part 2 of the purchase and sale agreement and its related subparts. Moreover, that being the case, the Lown Group has declined to purchase the property and will continue to do so until all clean-up obligations have been met. The Lown Group *444 has rejected suggestions by the plaintiff that it purchase the property at a reduced price, with the cleanup obligation remaining with the plaintiff.
With respect to the plaintiffs damages as a result of the contamination, the Court finds as follows:
At the time that the plaintiff entered into the purchase and sale agreement with the Lown Group, the purchase price of $1,725 million represented the fair market value of the property. In its current condition, the property is essentially unsalable. This is because the costs of final clean-up cannot be determined with any certainty, and financial institutions are therefore unlikely to be willing to grant loans secured by a mortgage on the property. Any buyer would most likely have to be a cash buyer. The plaintiffs expert on the subject testified that the fair market value of the property in its current condition is $500,000. The Court accepts that figure.
As previously indicated, effective September 1, 1994, if the property is not delivered “clean,” the agreed-upon purchase price is reduced to $1,675 million, and the annual rent is reduced from $ 180,000 to $130,000.
The plaintiff testified that when his original loan on the property expired in 1990, his lending institution, Baybank, increased his interest rate from 10% to 10V*j% The prevailing rate at the time was 8%. The plaintiff attributes this differential treatment of his loan to the risk associated with the contamination that had been discovered on the property. However, without other independent evidence on the point, the Court declines to make a finding to that effect.
The plaintiff seeks lost rents in the amount of $42,300 for the period June 15, 1987 to September 1989, the period between the time when the contamination was discovered and the lease agreement with the Lown Group became effective. However, 21 Long-wood was essentially vacant as of the spring of 1989. Hence, the Court cannot find that the plaintiff actually could have rented the premises for $42,300 or any other amount during the relevant period.
The plaintiff contends that because he was required to retain ownership of 21 Longwood after June 15, 1989, he was also required to manage the premises. He asserts that the reasonable value of his management services is 5% of the yearly rent of $180,000, for a total of $45,000 between 1989 and 1994, and he seeks recovery of that amount. Given that the lease was a “triple net” lease, the Court believes the $45,000 figure to be excessive. Moreover, the plaintiff incurred no actual out-of-pocket expenses in connection with management.
The plaintiff also contends that he possessed a $400,000 equity interest in the premises, and he seeks the loss of use of that equity pending the sale of the property. However, he is receiving a return on that equity in the form of rent. The plaintiffs total monthly expenses in relation to the property consist of $11,577 (exclusive of 2IE response costs). Thus, he has a positive cash flow of $3,500 per month or approximately $42,000 per year.
The plaintiff exercised his own legal skills to negotiate the second amended purchase and sale agreement and the lease associated with it, and to secure permitting for the Lown Group to operate a medical practice on the premises. He values those skills at $12,500. The Court does not have a sufficient basis on which to assess the reasonableness of that figure. Moreover, once again, the expenses were not out-of-pocket.
The plaintiff did sustain the following out-of-pocket expenses in direct response to the contamination of his property, all of which the Court finds to be fair and reasonable.
Brookline Police Department $440.00
Carr Dee 1,605.00
Clean Harbors 650.00
Dames & Moore 14,400.00
Fred C. Hart 5,000.00
Guild Drilling 3,417.51
Mass. DEP 1,200.00
Star Enterprises 1,392.00
Haley and Aldrich 35.551.47
Total $63,655.98
The plaintiff paid the following amounts for legal and other services necessary to bring about the negotiation and execution of the second amended purchase and sale agreement and the associated lease with the Lown Group:
Davis, Malm and D’Agostine $9,180.40
Merrill and McGeaiy 700.00
Personal Out-of-pocket Expenses 227.08
Barry Winer 500.00
Total $10,607.48
These expenses were reasonably incurred by the plaintiff to mitigate his damages.
Although the plaintiff did offer some evidence of expenses which he incurred in connection with the present litigation, that evidence was necessarily incomplete. The Court will receive further evidence in that regard subsequent to the issuance of these findings.
Rulings of Law
Based upon the above facts, the Court rules as follows:
1) No cause of action accrued to the plaintiff until June 12, 1989. Accordingly, none of the plaintiffs claims is barred by the applicable statute of limitations.
2) The defendants Adam and Maria Porikos, as the owners of 11 Longwood Avenue, the property upon which Mike’s Texaco is operated, are the owners of property from which there has been and threatens to be, a release of hazardous material within the meaning of G.L.c. 21E.
*445 3) The defendant Longwood Auto Specialists, Inc., as the operator of Mike’s Texaco at 11 Longwood Avenue, operates a property from which there has been, and threatens to be, a release of hazardous material within the meaning of G.L.c. 21E.
4) The aforementioned release and threat of release have caused the plaintiff to incur recoverable response costs of $63,655.98, which costs are recoverable as damages.
5) The aforementioned release and threat of release have also caused the plaintiff to expend the sum of $10,607.48 in mitigation of his losses resulting from the release, which sum is recoverable as damages.
6) The equitable relief which the Court is awarding, as set forth below, will otherwise make the plaintiff whole, such that no further damages need be awarded.
7) The defendants are not liable to the plaintiff in negligence, in that they did not fail to take reasonable precautions to insure that their tanks and piping system were free of leaks, at least until June 12, 1989, when they were apprised of the likelihood of a leak. All of their tanks and piping were new or nearly new as of 1982, and, acting through the defendant Adam Porikos, they had taken reasonable steps to ensure that such gasoline as entered the tanks came out through the pumps and the pumps alone.
8) The defendants were negligent in failing to undertake more refined tank tightness testing between June 12, 1989, when they were first apprised of the likelihood of a leak, and November 28, 1990, when they commenced such testing. However, the Court cannot find that such negligence was the proximate cause of any damage to the plaintiff beyond that which he had already sustained as of June 12, 1989.
9) Because a claim in nuisance is ultimately predicated on principles of negligence, the defendants are also not liable to the plaintiff in nuisance.
ORDER FOR JUDGMENT
Based upon the foregoing, it is hereby ORDERED that judgment enter for the plaintiff on Count I in the amount of $73,263.76.
In addition, as to Count I, the Court orders the following:
a)The defendants, Adam Porikos, Maria Porikos and Longwood Auto Specialists, Inc., are hereby ordered to remediate the contamination at 21 Longwood sufficiently to allow plaintiff Eric Rothenberg, Trustee of 21 Longwood Realty Trust, to submit a Remedial Response Action Completion Statement to the Department of Environmental Protection pursuant to 310 C.M.R. 40.537(11), indicating that the property has achieved a level of No Significant Risk in accordance with M.G.L.c. 21E and 310 C.M.R. 40.0000. This remediation must be completed no later than June 15, 1999.
b) The defendants, Adam and Maria Porikos, and Longwood Auto Specialists, Inc., are hereby ordered to remediate the contamination at 11 Longwood in order to achieve a level of No Significant Risk, in accordance with M.G.L.c. 21E and 310 C.M.R. 40.0000, in accordance with the following timetable:
1. by no later than June 15, 1996, the defendants are to have completed a Phase I report and, if applicable, a Phase II report in accordance with 310 C.M.R. 40.0834;
2. by no later than June 15, 1997, the defendants are to have provided notice to the Department of Environmental Protection of the commencement of Phase IV work, as required by 310 C.M.R. 40.0870 and 40.1403(5)(a), and are to have provided an implementation schedule for such work;
3. by no later than June 15, 1999, the defendants are to have produced a Response Action Outcome Statement pursuant to 310 C.M.R. 40.1000 and filed same with the Department of Environmental Protection;
4. the defendants will provide copies to Eric Rothenberg of all filings made to the Department of Environmental Protection in accordance with this Order.
c) The defendants are ordered to submit a claim to the state fire marshall in accordance with M.G.L.c. 21J, §6 for reimbursement from the Commonwealth’s Underground Storage Tank Petroleum Product Cleanup Fund for all amounts to which the defendants may by entitled by virtue of their liability to the plaintiff. The defendants are further ordered to assign their rights to any available monies under the Fund to the plaintiff. The defendants are ordered to perform any and all acts necessary under M.G.L.c. 21J, §10 to make them eligible for reimbursement from the Fund.
In the likely event that the defendants have not completed the remediation ordered above by September 1, 1994, they shall pay to the plaintiff the sum of $50,000, representing the reduction in purchase price set forth as of that date in the purchase and sale agreement between the plaintiff and the Lown Group. Commencing September 1, 1994, and on September 1 of each year thereafter during which the defendants have not completed the remediation ordered above, the defendants shall pay to the plaintiff the sum of $50,000, representing the reduction in rent set forth in the lease agreement between the plaintiff and the Lown Group.
The Court will retain jurisdiction over this action until it is satisfied that the defendants have complied with all of the provisions of this order.
Further proceedings will be held to determine the fair and reasonable costs to the plaintiff of this litigation, and a supplemental order will issue awarding such costs.
*446 Judgment shall enter for the defendants on Counts II and III of the complaint.
No evidence having been produced or agreement having been made on the defendants’ counterclaim, judgment shall enter for the plaintiff thereon.

 The report noted that an initial analysis of samples taken from the test borings showed levels of contamination which warranted “further testing” under state guidelines. However, the “further testing,” which was referenced was testing of the samples themselves, which testing was done and served as the basis for the final conclusions set forth in the report.

 A “first amendment" to the original purchase and sale agreement had been made on June 1, 1989. The substance of that amendment is not material to this action.

 No leaded gasoline was then kept on the premises.